**The STATE of Ohio, Appellant,**

**v.**

**NORRIS et al., Appellees.**

Court of Appeals of Ohio,
First District, Hamilton County.

Nos. C–010299, C–010300, C–010301 and C–010302.

Decided March 8, 2002.

Charles Rubenstein and Karla Burtch, for appellant.

Paul M. Laufman, for appellees.

GORMAN, Judge.

{¶ 1} This appeal presents a single question: whether the federal and state Constitutions permit the city of Cincinnati to enforce a general ordinance requiring the licensure of "massage practitioners" against those individuals whom its vice squad suspects of prostitution, while failing to enforce the same licensing requirement against a large number of known violators whom the vice squad

presumes innocent of illegal sexual activity. We hold that the right of equal protection secured by both the federal and the Ohio Constitutions does not permit the city to make such an arbitrary classification in the enforcement of a general licensing requirement.

{¶ 2} The plaintiff-appellant, the city of Cincinnati, brought complaints against the defendant-appellees Jonathan Webb, Christine Norris, and Toni Barnett ("the Webb appellees") for practicing massage without a license in violation of Cincinnati Municipal Code 897–5(a) and 897–21. Following an evidentiary hearing on the Webb appellees' motion to dismiss, the trial court held that the ordinance was both unconstitutionally overbroad and selectively enforced in violation of the Equal Protection Clause. While we reserve judgment on whether the ordinance is overly broad, we affirm the trial court's dismissal based upon the city's selective enforcement of the ordinance.

## I. Background

{¶ 3} On August 7, 1996, Cincinnati City Council adopted Ordinance 232–1996, enacting Chapter 897 of the Cincinnati Municipal Code, which governs "Licensing and Regulation of Massage Establishments and Massage Practitioners." Under Section 897–5(a), it is unlawful for any person to administer a massage for a fee, income, or consideration of any kind without first obtaining a massage-practitioner license from the city treasurer. Section 597–M–3 defines "massage" as "touching procedures upon the external parts of the body by hand * * * including stroking, friction, kneading, rolling, vibrating, cupping, petrissage, rubbing, effleurage and topoment." The parties stipulated that from 1996 to the date of the Webb appellees' arrest, the city treasurer had never issued the license required by Section 897–5 to any person or business, despite the fact that any number of individuals or businesses offering massage appeared in the Cincinnati Bell Yellow Pages.

{¶ 4} Officers of the Cincinnati Police Division Vice Section testified that the ordinance was enforced in two ways: upon a complaint by the public, or by its own self-initiated investigations. They testified that the arrest of the Webb appellees was the result of the vice squad's self-initiated sting operation for prostitution. As was their customary procedure, the officers, using the independent weekly newspaper *CityBeat*, called several listed telephone numbers appearing in "adult-type entertainment ads" that offered massage services, including nude massage. ("Nude" in the sense that the masseur is naked.[1]) They received

---

1. It is illegal in Cincinnati for both parties to a massage to be nude. The person receiving the massage must have his or her "private parts" covered by "opaque material." It is also illegal for the masseur to administer a massage in a manner intended to arouse or gratify the sexual

a "call back" from the Webb appellees, who agreed to provide "outcall" services at the address given by the officers. When the Webb appellees arrived at the designated address, they were admitted to an apartment by Officers Howard Fox and Chauncey Prude of the vice squad. After the officers paid a fee for services, Webb left. Norris and Barnett remained and removed their clothing. Naked, they performed massage on the officers, but apparently did not engage in any illegal sexual contact. Subsequently, the Webb appellees were arrested and charged with a violation of Section 897–5(a)—providing massage for hire without the required city license.

## II. Equal Protection and Selective Prosecution

{¶ 5} As we have noted, up until the time of the hearing on this matter, the city treasurer had never issued a license under Chapter 897. Thus, with the possible exception of very recent licensees, every business or individual providing massage for hire in the city of Cincinnati is in violation of the ordinance.

{¶ 6} The police have not instituted a general crackdown. The commander of the vice squad testified that, rather than simply consult the Yellow Pages, in which any number of unlicensed massage establishments and providers readily identify themselves as offenders, the vice squad targeted for enforcement of the licensing ordinance only those advertising under the "adult" section in *CityBeat*, or in adult-entertainment publications found in bars. The commander testified that self-initiated investigations did not include unlicensed massage establishments or providers who advertised massage services in the Yellow Pages, because "[w]e interpret therapeutic a license-type, legitimate, medical-type license massage." In other words, the city does not apply the local licensing requirement to those who it presumes are already licensed by the state and providing what the vice squad considers medicinal or therapeutic massages.

{¶ 7} Nowhere in the local licensing ordinance, however, is there any exemption for state-licensed massage providers. Nor does the ordinance make a distinction between therapeutic and non-therapeutic massages (accepting for the sake of argument that a nude massage is not therapeutic). The ordinance does have a list of exemptions: medical professionals (doctors and nurses), athletic trainers for professional or semi-professional sports teams, and even barbers and cosmetologists "provided their activity is limited to the head, face, or neck." The ordinance also specifically exempts persons "wholly employed in the sale of clothing, cosmetics, jewelry or sporting equipment insofar as these individuals

---

desires of the client, and for the masseur to "in any way touch the genitals of the individual receiving the treatment." Cincinnati Municipal Code 897–21(2)(i–iii).

must incidentally touch a customer to properly fit or sell the product, *at its standard market price.*"[2] (Emphasis added.) Cincinnati Municipal Code 827–29.

{¶ 8} In sum, the vice squad's distinctions between state-licensed and non-state-licensed providers, and therapeutic and non-therapeutic massages, find no support in the ordinance. Nor does the city code countenance slack enforcement of the licensing requirement. Under Section 801–1, entitled "License Requirements to be Complied With," the code makes clear that any person operating a business without the required municipal license does so unlawfully. In short, when it comes to licensing in Cincinnati, there is no spirit of the law, only the letter.

{¶ 9} In *Yick Wo v. Hopkins* (1886), 118 U.S. 356, 374, 6 S.Ct. 1064, 1073, 30 L.Ed. 220, the United States Supreme Court held:

{¶ 10} "Though the law itself be fair on its face, and impartial in appearance, yet, if it is applied and administered by public authority with an * * * unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the constitution."

{¶ 11} As noted by one writer, although "[t]raditional suspect class discrimination cases capture most of the headlines," individuals who are not within any suspect class are often victimized by discriminatory governmental misconduct. McGuinness, Equal Protection and Non–Suspect Class Victims of Governmental Misconduct: Theory and Proof of Disparate Treatment and Arbitrariness Claims (1996), 18 Campbell L.Rev. 333, 335–336. This is particularly true, the writer observes, at the local level:

{¶ 12} "Americans from all walks of life need constitutional protection from increasingly arbitrary and oppressive government power, more often at the local level. It appears that the greatest threat to civil liberties arises not from more remote sources of government power in Washington * * *. Rather, individuals are pervasively regulated and often harassed by smaller local governments which appear more likely to act arbitrarily or discriminatorily because the government authority tends to be concentrated among fewer power brokers with few if any checks on their authority. Sheriffs, police chiefs, town managers, building inspectors and other local officials are more subject to direct political pressures and therefore appear more prone to eviscerate the Constitution than typically more rational forces within the state and federal governments.

---

2. Apparently if the merchant offers too deep a discount, its employees may be guilty of providing an illegal massage through incidental contact.

{¶ 13} "A broad range of cases including government contracts, land use disputes, building permit squabbles, *business regulation*, education, *licensing and permit schemes*, law enforcement matters, *occupational licensing and regulation*, public employment and other disputes necessitate application of equal protection principles. These areas of traditional local government regulation are where meaningful equal protection is sorely needed." (Emphasis added.) Id. at 336–337.

{¶ 14} Even so, there is still a "strong presumption of regularity" in prosecutorial discretion. *Cleveland v. Trzebuckowski* (1999), 85 Ohio St.3d 524, 533, 709 N.E.2d 1148, 1155. A defendant asserting a violation of the right to equal protection because of selective prosecution "bears a heavy burden." Id. The right is not violated simply because others similarly situated are not prosecuted for similar conduct. *State v. Getsy* (1998), 84 Ohio St.3d 180, 204, 702 N.E.2d 866, 888–889. The standard is "intentional and purposeful discrimination." *State v. Freeman* (1985), 20 Ohio St.3d 55, 58, 20 OBR 355, 485 N.E.2d 1043, 1045.

{¶ 15} To support the defense of discriminatory selective prosecution, the Ohio Supreme Court, independently interpreting Section 2, Article I of the Ohio Constitution pursuant to *Michigan v. Long* (1983), 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201, has stated its own two-part test. First, the defendant must show that " 'while others similarly situated have not generally been proceeded against because of conduct of the type forming the basis of the charge against him, he has been singled out for prosecution.' " *State v. Flynt* (1980), 63 Ohio St.2d 132, 134, 17 O.O.3d 81, 407 N.E.2d 15, 17, quoting *United States v. Berrios* (C.A.2, 1974), 501 F.2d 1207, 1211. Second, the defendant must show that the "selection is 'deliberately based upon an unjustifiable standard such as race, religion, or *other arbitrary classification*.' " *Cleveland v. Trzebuckowski* (1999), 85 Ohio St.3d 524, 532, 709 N.E.2d 1148, 1155–1156, citing *State v. Wolery* (1976), 46 Ohio St.2d 316, 325–326, 75 O.O.2d 366, 348 N.E.2d 351, 358, and quoting *Oyler v. Boles* (1962), 368 U.S. 448, 456, 82 S.Ct. 501, 506, 7 L.Ed.2d 446 (emphasis supplied). See, also, *Trzebuckowski* at 534, 709 N.E.2d at 1155, fn. 4.

{¶ 16} In this case, the city has conceded that it has singled out a particular class for enforcement of the licensing ordinance: those massage establishments and providers that advertise in the "adult" section of *CityBeat* and adults-only publications. Such advertisements are generally salacious in nature, worded to emphasize the sensual rather than the medicinal rewards of a massage.[3]

---

3. As described by the commander of the vice squad, the advertisements consist of "things along the lines of sexual non-therapeutic massage done by 18-year-old bombshell, stud * * *."

{¶ 17} Rather than deny its prosecutorial policy, the city seeks to defend it, arguing that, while selective, the policy is not arbitrary, because it is the providers of these types of erotic massage, not their respectable counterparts, that the municipal licensing ordinance was meant to target. To support this proposition, the city cites the preamble to Ordinance No. 232–1996, which states, "[M]assage establishments frequently serve as fronts for prostitution and contribute to an environment that fosters a general degradation of civility and decline in community morals." The city also points out that the regulatory procedure in Section 897–7(A) permits the treasurer to license a massage provider only after an investigation and recommendation of the applicant by the chief of police. As part of the application process required by the ordinance, the applicant must provide information in eleven categories, including photographs, criminal record, fingerprints, and information concerning the applicant's training and experience in the practice of massage. Under Section 897–1(M)(3), the applicant must also have certification of satisfactory completion of a minimum of 160 hours of course instruction in anatomy, physiology, and massage or touching techniques from a school of massage approved by the State Medical Board of Ohio or an equivalent board from outside this state, or accredited by an accrediting agency recognized by the United States Department of Education or the Council on Post Secondary Accreditation. Absent these requirements, Section 897–11 provides that no license shall be issued.

{¶ 18} Even were we to consider, however, that the city has an articulable reason for its policy of selective enforcement, the result of such a selective policy is to create a completely arbitrary licensing scheme—one in which, until very recently, no one is (or ever has been) in compliance, almost all the known violators operate brazenly, and yet the police prosecute only a select few who fall into a hazy classification best described as erotic massage. Even if it is assumed that the type of massage providers touting erotic rubdowns are most likely not to meet the licensing requirements and are most likely to engage in criminal sexual contact, this does not alter the fact that the licensing requirement does not admit of such distinctions. Even those providers who meet the educational requirements and do not offer erotic rubdowns must have licenses. For the city to completely ignore this aspect of the licensing scheme and focus entirely on those massage providers that operate on the fringe of respectability essentially turns a general licensing scheme into a licensing scheme only for those who arouse the suspicion of the vice squad.

{¶ 19} Furthermore, this case apparently disproves the vice squad's hypothesis that all those who offer erotic and/or nude massage are also offering prostitution. Had Norris or Barnett actually done anything more than take off their clothes to administer massage to Officers Fox and Prude (conduct that has

yet to be criminalized by city council), they could have been charged with any number of criminal offenses. Indeed, even if they had not engaged in any state crimes of prostitution or sexual contact, they could still have been charged under Cincinnati Municipal Code 897–21(2)(i) had they offered their services in a manner "intended to arouse, appeal to or gratify sexual desires." Had they in "any way touch[ed] the genitals" of the officers, they could have been charged under Section 897–21. Both offenses are misdemeanors. Since they were not charged with any of these offenses, presumably no such contact occurred, and somehow their nudity was not intended to arouse, appeal to, or gratify the sexual desires of the officers. Their only crime, we must assume, was operating without a municipal license—as were all other massage establishments and providers in Cincinnati at the time of their arrest.

{¶ 20} Instead of assuring that all massage practitioners and establishments have a municipal license, as is clearly contemplated by the ordinance, the vice squad has turned the licensing ordinance into an enforcement tool in its battle against vice, targeting a narrow subset of known violators. But how a massage practitioner advertises, or where it advertises, or whether the provider is fully dressed or completely nude, while perhaps useful to police for investigation of prostitution, is irrelevant to enforcement of a general licensing requirement. Although city council may have been concerned with prostitution when it passed Ordinance No. 232–1996, it did not enact a specific anti-prostitution measure, but, rather, a general occupational licensing requirement. As written, Chapter 897 is a regulatory tool meant to apply to all massage establishments and practitioners, ensuring that minimum standards are met by all those who engage in the business or practice of massage, no matter what their purpose or degree of respectability. A day spa at a prestigious Hyde Park address is no more immune from the licensing ordinance than an anonymous individual offering nude "out-call" massage on the back pages of *CityBeat*. Nothing about the licensing requirement of Chapter 897 supports the city's contention that it was meant as an enforcement tool, selectively wielded by the vice squad against those whose idea of a legitimate massage does not match its own.

{¶ 21} Here, the vice squad has essentially applied its own value judgments to single out certain unlicensed persons, like the Webb appellees, for arrest and prosecution under an occupational licensing scheme that was intended for general enforcement. Such a value-laden standard in a regulatory field is completely artificial and totally inconsistent with the law in this city that *all* those who violate the licensing laws are lawbreakers subject to prosecution. We, therefore, hold that the city's selective enforcement of Cincinnati Municipal Code 897–5(a) by prosecuting those unlicensed practitioners of massage who advertise in *CityBeat* or other adult publications, and not those unlicensed practitioners who

openly advertise in the Yellow Pages, denies the Webb appellees equal protection as guaranteed by the United States and Ohio Constitutions.

### III. Overbreadth

{¶ 22} The overbreadth doctrine relates only to First Amendment issues. *State v. Brooks* (1996), 75 Ohio St.3d 148, 155, 661 N.E.2d 1030, 1037. The Webb appellees argue that the city's licensing of persons who practice massage for hire implicates First Amendment rights of speech, expression, and association, intruding too far into intimate personal relationships. See, generally, *State v. Burnett* (2001), 93 Ohio St.3d 419, 425, 755 N.E.2d 857, 862. As we have made an effort to note, the code section is striking in its reach, even going so far as to attempt to regulate the degree to which a salesperson or barber or cosmetologist can touch his or her customers. Although such relationships do not normally constitute intimate personal relationships, the Webb appellees argue that the language "consideration of any kind" could make criminal one spouse giving another a backrub in exchange for the other's favorite meal.

{¶ 23} It is well settled that constitutional issues should not be decided "unless absolutely necessary." *Mayer v. Bristow* (2000), 91 Ohio St.3d 3, 9, 740 N.E.2d 656, 662. A court is under a duty to give a statute, whenever possible, a reasonable construction that would render it constitutionally definite. *State v. Dorso* (1983), 4 Ohio St.3d 60, 61, 4 OBR 150, 446 N.E.2d 449, 450, citing *United States v. Harriss* (1954), 347 U.S. 612, 618, 74 S.Ct. 808, 812, 98 L.Ed. 989. It cannot be imagined that a court, when actually confronted with such a case, could reasonably construe Chapter 897 as regulating such behavior as spousal backrubs, or even consensual sexual favors among adults not in the business of giving massages for hire. In any case, having held that the city's selective enforcement of the ordinance against the Webb appellees violates their equal-protection rights, we need not address the larger issue of unconstitutional overbreadth.

{¶ 24} The judgment of the trial court is, accordingly, affirmed.

Judgment affirmed.

PAINTER, P.J., concurs.

HILDEBRANDT, J., concurs separately.

HILDEBRANDT, Judge, concurring.

{¶ 25} I concur in the lead opinion with respect to the equal-protection argument raised in the case at bar. I write separately, though, to emphasize that the city, which is entrusted with protecting the health and safety of its citizens,

acted within its well-established powers in enacting the ordinance at issue here. Undoubtedly, it is within the purview of the city to ensure that those who perform massage services do so in a safe and professional manner. Nonetheless, the city's concession that the ordinance is enforced against only a narrowly circumscribed set of practitioners necessitates the result reached in the lead opinion. Only upon such evidence of selective enforcement should we hold that the city's lawful powers have been improperly exercised. I otherwise concur in full in the lead opinion's disposition of the overbreadth issue.