[Cite as *Cleveland v. Thorne*, 2013-Ohio-1029.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**Nos. 98365, 98474, 98503, 98695, 98696, and 98697**

## CITY OF CLEVELAND

PLAINTIFF-APPELLEE

vs.

## RANDALL S. THORNE, ET AL.

DEFENDANTS-APPELLANTS

### JUDGMENT:
AFFIRMED

Criminal Appeal from the
Cleveland Municipal Court
Case Nos. 2010-CRB-045821, 2011-CRB-005874, 2011-CRB-005875,
2011-CRB-005876, 2011-CRB-008819, 2011-CRB-008820,
2011-CRB-008821, 2011-CRB-009055, and 2011-CRB-009059

**BEFORE:** Celebrezze, P.J., E.A. Gallagher, J., and E.T. Gallagher, J.

**RELEASED AND JOURNALIZED:** March 21, 2013

**ATTORNEY FOR APPELLANTS**

Donald J. Malarcik
The Gothic Building
54 E. Mill Street
Suite 400
Akron, Ohio   44308


**ATTORNEYS FOR APPELLEE**

Barbara A. Langhenry
Law Director
City of Cleveland
Department of Law
BY:    L. Stewart Hastings
Chief Assistant Director of Law
601 Lakeside Avenue
Room 106
Cleveland, Ohio   44114-1077

Victor R. Perez
Chief Prosecutor
City of Cleveland
The Justice Center
1200 Ontario Street
Cleveland, Ohio   44113

FRANK D. CELEBREZZE, JR., P.J.:

{¶1} In this consolidated appeal, several proprietors and employees of three businesses engaged in the sale of network access time with accompanying sweepstakes entries challenge their convictions for operating a gambling house. After a thorough review of the pertinent law and the record, we affirm those convictions.

I. Factual and Procedural History

{¶2} Three establishments were separately raided by Cleveland police because of suspected gambling activity. The three businesses offered substantially similar environments and services. Each used a system called VS2 to offer for sale network access time. Patrons could purchase network access time at a rate of 25 cents per minute. Patrons would also receive 100 sweepstakes points for every one dollar spent on network access time. Those sweepstakes points could then be used to play simulated casino-style games to reveal winning entries. Customers could also have the cashier or an automated cashier system instantly reveal any winning entries. Patrons with winning entries accumulated "winning points," which could be used to buy more network access time or be exchanged for cash at a value of one cent per point. These businesses have come to be known as "cyber cafés" or "internet cafés."

{¶3} Internet Depot, located on West 117th Street, was owned by Randall Thorne. Black Hawk I, located on Lakeshore Boulevard, and Black Hawk II, located on St. Clair Avenue, were both owned by Michael Harris. Employees of Black Hawk I and II, also charged in these cases, include Bona Suon, Sreyleak Ny, Team Ny, and Catherine Miller.

These establishments offered patrons a lounge-like environment with computer terminals capable of connecting to the internet. The computer terminals also allowed users to play games in a "fun games" section or to play simulated casino-style games using sweepstakes points. The businesses offered free food and beverages, lounges with large-screen televisions, as well as printing, faxing, and similar business services.

{¶4} In 2010 and 2011, detectives from the Intelligence Unit of the Cleveland Police Department conducted undercover surveillance of Internet Depot and Black Hawk I and II. Detectives went in and gave money to the cashier. They were provided with magnetic swipe cards that contained account information. The accounts were loaded with network access time and sweepstakes points. The detectives sat at a computer terminal, swiped their cards, and then played casino-style games. They either won, accumulating winning points, or lost. If they won, they would take their cards to the cashier and be given cash.

{¶5} After conducting a number of operations at each location, Det. Jason Steckle, lead investigator, sought and obtained search warrants for Internet Depot and Black Hawk I and II. Officers raided each location, seizing cash, computer terminals and servers, and associated equipment.

{¶6} The employees and owners of these establishments were charged with gambling, in violation of Cleveland Codified Ordinances ("CCO") 611.02(a)(2); operating a gambling house, in violation of CCO 611.05; and possession of criminal tools, in violation of CCO 625.08. The cases were consolidated for trial. Appellants

filed suppression motions, which were heard by the court on April 28, 2011,[1] and May 19, 2011.

{¶7} At the first hearing, Det. Steckle testified for the city of Cleveland (the "City"). He testified about his and other officers' experiences inside these establishments. He indicated a casino-like environment with people playing casino-style games. He also testified that they did not observe anyone using the internet or the other business services offered. Appellants argued that Det. Steckle made knowing omissions or false statements in his search warrant affidavit because he indicated a patron could purchase sweepstakes points. They argued, and computer gaming expert Nick Farley testified, that sweepstakes points could not be purchased, but were free when one purchased network access time.

{¶8} The trial court found the statements made in the affidavit were not knowingly false statements, but found four omissions that should have been included. The court went on to find sufficient evidence of criminal activity to justify the issuance of the warrants and denied the motion to suppress. The court recognized that the second suppression hearing encompassed the same issues and testimony involved in the first hearing and also denied this motion on May 19, 2011.

{¶9} After several pretrial motions were disposed of, including a motion to dismiss based on selective prosecution, trial commenced on March 9, 2012. The City called Det.

---

[1] The transcript indicates this hearing took place August 28, 2011. This must be a clerical error because the journal entry taking judicial notice of this testimony is dated May 19, 2011.

Steckle as well as Detectives Patricia Hasan and Pamela Zimmerman.   The City was also set to call about 20 patrons of the businesses who would testify they went there to gamble.  Appellants entered into a stipulation that these people went to the businesses in hopes of pecuniary gain. Therefore, they did not testify.   The state rested and appellants made a Crim.R. 29 motion to dismiss based on insufficient evidence.   The court overruled the motion.

{¶10} Appellants called one witness, Nick Farley, to testify about the legality of the system.   He is an engineer employed in the gaming industry to investigate and certify that various gaming systems comply with federal, state, and local laws.   He testified that the systems used in these three businesses, called VS2, were manufactured by a New Jersey company and are widely used throughout the country.   He further explained that there was no element of consideration involved because customers could not purchase sweepstakes points, and these points had no value.   Customers had to purchase network access time and then would receive sweepstakes points free.   He elaborated that sweepstakes points also had no value because they could not be exchanged for cash. Only winning points could be exchanged for cash.

{¶11} After appellants rested and their renewed Crim.R. 29 motion was denied, the jury was charged and set off to deliberate.   The jury asked three questions during deliberations.   Two dealt with the photographic exhibits and which establishment each photo represented.   The third asked for a definition of valuable consideration.   The judge issued a definition over appellants' objection, which was taken from *Black's Law*

*Dictionary* and *Troy Amusement Co. v. Attenweiler*, 64 Ohio App. 105, 28 N.E.2d 207 (2d Dist.1940).

{¶12} The jury returned guilty verdicts for all defendants as indicted. Each appellant was sentenced and appealed. In this consolidated appeal, appellants assert six assignments of error:

I. The trial court erred by failing to grant appellants' motion to suppress.

II. The trial court committed reversible error by giving an incorrect and prejudicial jury instruction on the essential element of an exchange of valuable consideration.

III. The trial court erred by failing to dismiss the charges against appellants for selective prosecution.

IV. The trial court erred in failing to grant motions for acquittal pursuant to Crim.R. 29.

V. The trial court erred in entering judgment on the verdicts not supported by sufficient evidence.
VI. Appellants' convictions were against the manifest weight of the evidence.

## II. Law and Analysis

### A. Suppression

{¶13} Appellants first claim the trial court erred when it denied their suppression motion. They claim there was insufficient evidence of criminal activity to justify the issuance of a warrant once material omissions and false statements made by Det. Steckle were removed. Appellants argue that the trial court identified four statements that were omissions or misleading statements dealing with Det. Steckle's characterization of appellants' business model, which were used to obtain the warrant. Once these

statements are appropriately set aside or included, sufficient evidence of criminal wrong-doing does not exist to justify the issuance of a search warrant.

> The task of the issuing magistrate is simply to make a practical common-sense decision whether, given all the circumstances before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed.

*Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). The Ohio Supreme Court has affirmed this standard. *State v. George*, 45 Ohio St.3d 325, 544 N.E.2d 640 (1989).

**{¶14}** Appellants argue that the affidavits attached to the various warrant applications contained material omissions and knowingly false statements by police officers. Citing the "rules" prominently placed by the cashier windows, which also must be accepted by the user on the computer terminals before games may be played, they claim officers knew there was no way to buy sweepstakes entries and that sweepstakes points had no value. This contradicts the statements in the affidavits that customers "wager" money and "buy sweepstakes points."

**{¶15}** However, from the perspective of police officers and the average customer coming through the door, one provides money and receives sweepstakes points, which are then used to play casino-style games in hopes of winning money. Nick Farley testified at the suppression hearing that these patrons were actually buying network access time and receiving free sweepstakes points, which had no value. But he is an expert in analyzing

such systems and had previously done extensive analysis on the VS2 systems used by these appellants. The evidentiary standard to be satisfied is not beyond a reasonable doubt, but only that sufficient probable cause existed to believe that criminal activity was ongoing.

> In reviewing the sufficiency of probable cause in an affidavit submitted in support of a search warrant issued by a magistrate, neither a trial court nor an appellate court should substitute its judgment for that of the magistrate by conducting a de novo determination as to whether the affidavit contains sufficient probable cause upon which that court would issue the search warrant. Rather, the duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed. In conducting any after-the-fact scrutiny of an affidavit submitted in support of a search warrant, trial and appellate courts should accord great deference to the magistrate's determination of probable cause, and doubtful or marginal cases in this area should be resolved in favor of upholding the warrant.

*George*, at paragraph two of the syllabus. Here, the statements made regarding gambling activity were not knowingly false statements or omissions because they were reasonable observations of the operations of appellants' businesses. Simply because appellants attempted to legitimize gambling activities does not mean law enforcement must blindly accept these artificial constructs, as explained in the sufficiency and manifest weight assignments of error below.

{¶16} Appellants also claim the affidavits failed to mention that sweepstakes points could be obtained for free simply by asking. They also claim that Det. Steckle made mention of a prior investigation where Black Hawk was suspected of gambling, but failed to mention that no charges were filed, and the computer terminals seized were

eventually returned.  Appellants also point out that Det. Steckle failed to mention that playing sweepstakes games does not diminish network access time.

{¶17} Even with these statements added or excluded, as appropriate, the affidavits still demonstrate probable cause of criminal activity.  Det. Steckle described casino-like environments that were advertised as such with swipe cards and flyers bearing references to games of chance and people playing casino-style games in hopes of winning money.  This is sufficient evidence to warrant further investigation and the issuance of a search warrant.

{¶18} Appellants' first assignment of error is overruled.

B. Jury Instruction

{¶19} Appellants next take issue with a jury instruction given by the court that defined "valuable consideration" after it was not originally defined for the jury and the jury inquired as to its legal meaning.

> When reviewing a trial court's jury instructions, the proper standard of review for an appellate court is whether the trial court's refusal to give a requested instruction or giving an instruction constituted an abuse of discretion under the facts and circumstances of the case.  *See State v. Wolons* (1989), 44 Ohio St.3d 64, 68, 541 N.E.2d 443.  In addition, jury instructions are reviewed in their entirety to determine if they contain prejudicial error.  *State v. Porter* (1968), 14 Ohio St.2d 10, 235 N.E.2d 520.

*State v. Williams*, 8th Dist. No. 90845, 2009-Ohio-2026, ¶ 50.  To constitute an abuse of discretion, the ruling must be unreasonable, arbitrary, or unconscionable.  *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 450 N.E.2d 1140 (1983).

{¶20} Here, after the jury asked the court to define "valuable consideration," the trial court did so using wording taken from the 1940 edition of *Black's Law Dictionary* and *Troy Amusement Co. v. Attenweiler,* 64 Ohio App. 105, 28 N.E.2d 207 (2d Dist.1940). The *Troy* case involves a "scheme of chance" operated by a movie theater to develop business and interest in movies. The trial court advised the jury as follows:

> Valuable consideration may consists [sic] of either in the benefit of to [sic] the promisor or a detriment to the promisee and may consist in some right, interest or profit or benefit to one party or some forbearance, detriment, loss or responsibility given, suffered, [or] undertaken by the other.

> Consideration does not mean that pay shall be directly given for the right to participate. It is only necessary that the person entering the activity shall do something or give up some right sufficient to comply with that requirement.

{¶21} The first part of the instruction mirrors the standard definition of consideration and helps the jury understand a term that has a specific legal definition with which most members of the public would be unfamiliar. The second paragraph is taken from case law involving a similar issue as the one here — consideration in a scheme of chance. However, "[t]he obtuse legalese and confounding abstracts gleaned from previous decisions and case books were never meant to be used by layman. Such language is the vernacular of a sophisticated professional body and may be confusing to a jury." *Viock v. Stowe-Woodward Co.*, 6th Dist. No. E-84-27, 1986 Ohio App. LEXIS 6004 (Mar. 14, 1986), *32.

{¶22} Here, the first part of the instruction is appropriate guidance in helping the jury determine a key aspect of this case — consideration. The instruction aids the jury in

understanding this concept. Appellants argue the definition has changed over time and that a more recent edition of *Black's Law Dictionary* should have been consulted. However, the definition provided by appellants in their brief is substantially similar,[2] but not as easy for a layperson to understand. The second part of the definition was taken from a court analyzing a gambling statute that was significantly more restrictive than current laws. The scheme in *Troy Amusement* would likely not be prohibited by current gambling laws.

{¶23} That said, we find any error harmless. Any error will be deemed harmless if it did not affect the accused's "substantial rights." Otherwise stated, the accused has a constitutional guarantee to a trial free from prejudicial error, not necessarily one free of all error. Before constitutional error can be considered harmless, we must be able to "declare a belief that it was harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

{¶24} "[I]nstructions should be viewed in a common sense perspective and not through the 'remote and distorting knothole of a distant appellate fence.'" *Id*., citing *Time, Inc. v. Hill*, 385 U.S. 374, 418, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967). Appellants argue that this definition permits nearly anything to constitute consideration. There was never any issue with intangible benefits or detriments given as consideration in this case. This case comes down to whether money paid to appellants was for network access time or to

---

[2] "Consideration that is valid under the law; consideration that either confers a pecuniary measurable benefit on one party or imposes a pecuniarily measurable detriment on the other." *Black's Law Dictionary*, 326 (8th Ed.2004).

participate in a scheme of chance in hopes of gain. The key disagreement between the City and appellants was that patrons paid for network access time and received free sweepstakes points as a result. Disregarding the contrivances, it is clear that the only consideration argued by the City was that patrons provided money to play casino-style games in hopes of winning money. The trial court's instruction regarding intangible benefits or detriments was surplusage, but was harmless.

## C. Selective Prosecution

**{¶25}** Appellants next argue that they were singled out for prosecution because other businesses operate similar sweepstakes games, including McDonald's, and Coca-Cola.

**{¶26}** The decision whether to prosecute a criminal offense is generally within the prosecutor's discretion. *United States v. Armstrong*, 517 U.S. 456, 464, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996). "There is * * * a 'strong presumption of regularity' in prosecutorial discretion." *State v. Norris*, 147 Ohio App.3d 224, 229, 2002-Ohio-1033, 769 N.E.2d 896 (1st Dist.). In order to establish a case of selective prosecution, a criminal defendant must make a prima facie showing:

> (1) that, while others similarly situated have not generally been proceeded against because of conduct of the type forming the basis of the charge against him, he has been singled out for prosecution, and (2) that the government's discriminatory selection of him for prosecution has been invidious or in bad faith, i.e., based upon such impermissible considerations as race, religion, or the desire to prevent his exercise of constitutional rights.

*State v. Flynt*, 63 Ohio St.2d 132, 134, 407 N.E.2d 15 (1980).

{¶27} The defendant's burden of establishing discriminatory prosecution is a heavy one. *State v. Freeman*, 20 Ohio St.3d 55, 58, 485 N.E.2d 1043 (1985). "The mere failure to prosecute other violators of the statute which appellants were charged with violating does not establish the defense of selective prosecution." *Id.* Selectivity in enforcement does not constitute a constitutional violation unless the discrimination is "intentional or purposeful." *Flynt* at 134, quoting *Snowden v. Hughes*, 321 U.S. 1, 8, 64 S.Ct. 397, 88 L.Ed. 497 (1944). Moreover, the mere existence of a potential discriminatory purpose does not, by itself, show that such purpose motivated a particular defendant's prosecution. *Freeman* at 58.

{¶28} Here, appellants argue that their sweepstakes are no different from those operated by other businesses. They cite to McDonald's® Monopoly® game as an example, among others. However, these schemes of chance are not similar to the one operated by appellants. In those games, the product sold is not a clever ruse to legitimize gambling activity. When examining similarly situated individuals, the City has brought several prosecutions of other cyber or internet cafés that have attempted to operate within its boundaries.

{¶29} Appellants have failed to demonstrate that other similarly situated individuals have not been prosecuted for engaging in similar schemes of chance. In fact, in this case, three separate establishments owned by two different individuals are represented. Appellants' assigned error is therefore overruled.

### D. Sufficiency of the Evidence and Manifest Weight

{¶30} In their fourth, fifth, and sixth assignments of error, appellants challenge the sufficiency of the evidence sustaining their convictions as well as allege that the jury's verdict is against the manifest weight of the evidence.

{¶31} Whether the evidence is legally sufficient to sustain a verdict is a question of law. *State v. Robinson*, 162 Ohio St. 486, 124 N.E.2d 148 (1955). A conviction based on legally insufficient evidence constitutes a denial of due process. *Tibbs v. Florida*, 457 U.S. 31, 45, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982), citing *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

{¶32} Where there is substantial evidence on which the trier of fact has based its verdict, a reviewing court abuses its discretion in substituting its judgment for that of the trier of fact as to the weight and sufficiency of the evidence. *State v. Nicely*, 39 Ohio St.3d 147, 156, 529 N.E.2d 1236 (1988). On review, the appellate court must determine, after viewing the evidence in a light most favorable to the prosecution, whether any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 273, 574 N.E.2d 492 (1991).

{¶33} Sufficiency of the evidence is subject to a different standard than is manifest weight of the evidence. Article IV, Section 3(B)(3) of the Ohio Constitution authorizes appellate courts to assess the weight of the evidence independently of the factfinder. Thus, when a claim is assigned concerning the manifest weight of the evidence, an appellate court "has the authority and duty to weigh the evidence and to determine whether the findings of * * * the trier of facts were so against the weight of the evidence

as to require a reversal and a remanding of the case for retrial." *State ex rel. Squire v. Cleveland*, 150 Ohio St. 303, 345, 82 N.E.2d 709 (1948).

**{¶34}** On application of the standards enunciated in *Tibbs*, the court in *State v. Martin*, 20 Ohio App.3d 172, 485 N.E.2d 717 (1st Dist.1983), has set forth the proper test to be utilized when addressing the issue of manifest weight of the evidence. The *Martin* court stated:

> The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*Id*. at 175.

**{¶35}** The system used by appellants constructs a thinly veneered facade constituting the flimsiest of walls separating the consideration paid from the opportunity for gain through chance. As has long been recognized,

> no sooner is a lottery defined, and the definition applied to a given state of facts, than ingenuity is at work to evolve some scheme of evasion which is within the mischief, but not quite within the letter of the definition. But, in this way, it is not possible to escape the law's condemnation, for it will strip the transaction of all its thin and false apparel and consider it in its very nakedness. It will look to the substance and not to the form of it, in order to disclose its real elements and the pernicious tendencies which the law is seeking to prevent.

*State v. Lipkin*, 169 N.C. 265, 271, 84 S.E. 340 (1915).

**{¶36}** CCO 611.02(a) prohibits gambling, with exceptions set forth in subsection (b), stating:

> No person shall do any of the following:

(1)  Engage in bookmaking, or knowingly engage in conduct that facilitates bookmaking;

(2)  Establish, promote, or operate or knowingly engage in conduct that facilitates any game of chance conducted for profit or any scheme of chance;

(3)  Knowingly procure, transmit, exchange, or engage in conduct that facilitates the procurement, transmission, or exchange of information for use in establishing odds or determining winners in connection with bookmaking or with any game of chance conducted for profit or any scheme of chance;

(4)  Engage in betting or in playing any scheme or game of chance as a substantial source of income or livelihood;

(5)  With purpose to violate this section, acquire, possess, control, or operate any gambling device.

**{¶37}** Further, CCO 611.05 prohibits the operation of a gambling establishment.

This ordinance states:

No person, being the owner or lessee, or having custody, control, or supervision of premises, shall:

(1)  Use or occupy such premises for gambling in violation of Section 611.02 or R.C. 2915.02;

(2)  Recklessly permit such premises to be used or occupied for gambling in violation of Section 611.02 or R.C. 2915.02.

**{¶38}** Cleveland Codified Ordinances 611.01(qq) defines "slot machine" as

[a]ny mechanical, electronic, video, or digital device that is capable of accepting anything of value, directly or indirectly, from or on behalf of a player who gives the thing of value in the hope of gain, the outcome of which is determined largely or wholly by chance; [or] * * * [a]ny mechanical, electronic, video, or digital device that is capable of accepting anything of value, directly or indirectly, from or on behalf of a player to conduct or dispense bingo or a scheme or game of chance.

{¶39} CCO 611.01(b) defines a "bet" as "the hazarding of anything of value upon the result of an event, undertaking, or contingency, but does not include a bona fide business risk." CCO 611.01(c) defines a "scheme of chance" as "a slot machine, lottery, numbers game, pool conducted for profit, or other scheme in which a participant gives a valuable consideration for a chance to win a prize, but does not include bingo, a skill-based amusement machine, or a pool not conducted for profit." It also defines "game of chance" under subsection (d) as "poker, craps, roulette, or other game in which a player gives anything of value in the hope of gain, the outcome of which is determined largely by chance, but does not include bingo."

{¶40} Finally, CCO 625.08 prohibits the possession of criminal tools, defined in relation to this case as "[a]n electric media device when information from the device, obtained pursuant to law, indicates that the device was intended for criminal use[.]"

{¶41} At trial, it was essentially conceded that these businesses operated chance-based sweepstakes that offered the chance for monetary gain. It was also conceded that patrons participated in hopes of gain. The primary contested issue was whether those patrons provided anything of value for a chance to participate. This is because under all the above definitions, an exchange of valuable consideration is necessary to find a criminal violation. Appellants argue that patrons purchased internet access time and that this time was not diminished as a result of the sweepstakes offered. The network access time remained and was a valuable product that patrons paid for and

received.  The sweepstakes points were given free as a promotion and had no actual value.

**{¶42}** Stripping away the contrivance that couches the transaction as legitimate leads to a test that examines what is at the heart of the exchange:  Whether the sweepstakes points are there to drive the sale of network access time, or whether the sale of network access time is there simply to legitimize gambling.  Evidence and inferences reasonably drawn from that evidence, which show that the latter is true, is sufficient for a finding of consideration in the transaction.

**{¶43}** The Fifth Circuit Court of Appeals confronted a case involving a similar computer system and was even confronted with similar testimony by Nick Farley. *United States v. Davis*, 690 F.3d 330 (5th Cir.2012).  That court affirmed convictions for violations of substantially similar federal gaming laws, overruling the same lack-of-consideration argument raised here.  In doing so, it found,

> a reasonable fact-finder could infer that the sale of Internet time at the defendants' cafés was an attempt to legitimize an illegal lottery. Customers' receipts indicating over 300,000 minutes of Internet time remaining were evidence that the customers did not value the Internet time they had purchased.  Further evidence that customers did not value their Internet time was the investigating police officers' uniform testimony that during each of their visits to a café, all of the people there were only engaged in playing the sweepstakes — not accessing the Internet or using any of the other services provided.  In addition to the customers' apparent disregard for the value of Internet time, there was evidence which casts doubt upon the defendants' claim that they intended to be legitimate, full-service Internet, faxing, copying, and word-processing vendors. For example, the manager of the Nederland testified that Davis said that he was "not worried about" the roughly $400 every two months in revenue from services other than Internet time and simply told the manager to keep it. The defendants' focus on income from the sale of Internet time to the

exclusion of income derived from other services offered by the cafés could reasonably raise the inference that the defendants offered the other services merely as an attempt to make it appear that their sale of Internet time was part of a full-service business, instead of a mechanism for legitimizing unlawful activity. Further evidence that the defendants' true purpose for the cafés was to create a place where people would be comfortable staying for a long time, purchasing Internet time and playing the sweepstakes, was the casino-like atmosphere at the cafés, complete with tinted windows and free food and drink. Finally, it is reasonable to infer that Davis's and Clark's purpose for the cafés was to legitimize illegal gambling from the fact that café customers were required to sign a form stating that they were not gambling upon entering at least one of the cafés; legitimate businesses ordinarily do not require such formalities.

*Id.* at 339.

{¶44} Here, appellants stipulated that customers went to these establishments in hopes of winning money. The jury could draw the logical conclusion that they did so, not for internet time, but for gambling. The businesses involved had similar casino-like environments — offering relaxing lounge areas and free food and drink. The officers uniformly testified that they witnessed no one using the other business services offered. Here, the advertising materials submitted into evidence did not resemble those used by Kinkos®  or other would-be competitors mentioned at trial, but were more like those used by casinos. One advertisement consisted of a black background with gold "777" printed on it. The impression conveyed by these advertisements was for a casino, not business services or internet access.

{¶45} Analyzing the "predominate purpose" of the transaction has been criticized by some courts and commentators as inappropriate in the criminal context,[3] but the

---

[3] *See Toledo v. Dabish*, Toledo M.C. No. CRB-08-2S138 (Nov. 18, 2009).   But

justice system is not some lumbering oaf who must ignore the patently obvious gambling scheme apparent here simply because of a contrived separation between consideration and the scheme of chance. By advertising these businesses as casinos, appellants obviously intended gambling to occur on their premises. They should not be surprised that law enforcement and the jury saw these same things and found sufficient evidence of gambling.

{¶46} From this evidence, the jury could reasonably conclude that appellants offered network access time in an attempt to legitimize illegal gambling activity. Therefore, appellants' convictions for gambling, operating a gambling house, and possession of criminal tools are supported by sufficient evidence. The VS2 network terminals qualify as slot machines because they indirectly accept something of value to participate in a scheme of chance. Because the operation of these terminals was done for profit, appellants are guilty of gambling, as defined, and operating a gambling house.

{¶47} Also, the convictions are not against the manifest weight of the evidence. The evidence shows that a system devised to skirt the law by constructing straw man after straw man operates as an illegal gambling machine or slot machine, as defined by the City. The law in this arena serves no purpose to elevate form to such a high degree that

---

for civil cases applying this standard in an administrative hearing setting, *see, e.g., Katmandu, Inc. v. Liquor Control Commn.*, 10th Dist. No. 02AP-546, 2002-Ohio-6743, and *Freedom Concepts, Inc. v. Ohio Liquor Control Comm.*, 10th Dist. No. 02AP-913, 2003-Ohio-4686 (noting that the same criminal elements must be shown for a violation of liquor control regulations, albeit with a lower standard of proof.)

the nature of the transaction should be ignored. The state of Ohio and municipalities have long-standing prohibitions that sharply prohibit gambling, and there is no justification for ignoring the nature of the transaction here simply because the system is designed in such a way as to artificially isolate one part of the illegal transaction from another. The justice system is not so blinded by chicanery.

## III. Conclusion

{¶48} Appellants' attempts to couch their illegal activities as legitimate business enterprises fail. The businesses operated casino-style establishments, advertised them as such, and profited from those operations. This is a violation of the Cleveland Codified Ordinances. The trial court did not err in upholding the issuance of a search warrant based on undercover investigations where officers observed this gambling activity. Also, these businesses are not similarly situated to other legitimate businesses operating sweepstakes as a marketing device. Therefore, appellants' arguments about selective prosecution fail.

{¶49} Judgment affirmed.

It is ordered that appellee recover from appellants costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the Cleveland Municipal Court to carry this judgment into execution. The defendants' convictions having been affirmed, any bail pending appeal is terminated. Cases remanded to the trial court for execution of sentences.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of

the Rules of Appellate Procedure.


FRANK D. CELEBREZZE, JR., PRESIDING JUDGE

EILEEN A. GALLAGHER, J., and
EILEEN T. GALLAGHER, J., CONCUR